Ludwig Nissen and Elizabeth Schultz, Respondents, *v.* James A. McCafferty and Others, Appellants.

Second Department, July 21, 1922.

Deeds — restrictive covenants — action to restrain execution of deed without setback restriction — vacant property purchased by residents on street to protect building line — parties orally agreed to setback line on street — property conveyed to trust company for sale and conveyed with consent of purchasers with setback agreement — executors of one of original purchasers of vacant lot conveyed testator's residence without setback agreement — witnesses — another resident on street and party to vacant lot agreement was not interested in event within meaning of Civil Practice Act, § 347 — said purchaser will be restrained from conveying without putting setback agreement in deed — said purchaser had knowledge of understanding between property owners on street.

Several residents on a street purchased vacant property for the purpose of protecting the building line after they had been informed that the property was to be sold at public auction without restrictions. It was orally agreed between the parties that no building would be built nearer the street than a certain line. The parties contributed their share to the purchase price of the vacant lot and it was conveyed to a trust company to be sold with the consent of the purchasers. The vacant property was subsequently sold to one of the parties to the agreement under a contract of sale containing a setback clause and thereafter the purchaser who was one of the original parties interested in the vacant lot and two other residents on the street entered into a written agreement establishing the building line for their respective properties. The owner of the property in question in the present case, who was one of the parties to the vacant lot agreement, died and his executors conveyed his property to one of the defendants without any reference to a building line agreement. This action was brought by two residents who were parties to the purchase of the vacant lot to restrain the execution of a deed without any setback covenant.

*Held,* that another resident and property owner on the street who was one of the parties to the purchase of the vacant lot was not interested in the event and, therefore, was not disqualified as a witness under section 347 of the Civil Practice Act, for any judgment entered therein could not be offered in evidence for or against him in another action commenced by him.

The parol agreements and understandings between the several residents on the street that the property of each should be subject to a setback agreement and that no building should be constructed closer to the street than the then existing building line is enforcible in equity against each piece of property and, though the record title of the defendant purchaser is unrestricted and he has entered into no agreement concerning a setback, he will be restrained from executing a deed unless it does contain a restrictive covenant conforming to the agreement entered into between the several residents on the street.

The evidence establishes that the defendant purchaser had knowledge that the owners on the street had entered into a contract to preserve the building line.

Appeal by the defendants, James A. McCafferty and others, from a judgment of the Supreme Court in favor of the plaintiffs,

entered in the office of the clerk of the county of Kings on the 17th day of December, 1921, upon the decision of the court rendered after a trial at the Kings Special Term.

*Luke D. Stapleton* [*James S. Regan* with him on the brief], for the appellant McCafferty.

*Meier Steinbrink* [*Frank E. Johnson* and *Joseph J. Schwartz* with him on the brief], for the appellants Aaron and others.

*William G. Cooke* [*Howard O. Wood* with him on the brief], for the respondents.

KELBY, J.:

Action for an injunction to restrain the defendant McCafferty and his assigns from making a deed of certain real property acquired by McCafferty from the executors of James N. Wallace, deceased, unless there be incorporated in the deed certain setback restrictions alleged to have been theretofore made by Wallace in his lifetime.

In 1917 James M. Wallace owned a house and lot on the south side of St. Marks avenue, having 100 feet frontage on St. Marks avenue and running through the block to the next street to the south, Prospect place. Wallace's property was situate between New York avenue and Brooklyn avenue. On the same side of St. Marks avenue, in the same block and 250 feet to the east of the Wallace property, was a vacant lot with a frontage of 75 feet on St. Marks avenue and running through to the south to Prospect place. In May, 1917, there appeared on this vacant lot a notice that said lot would be sold at an unrestricted auction sale. The remainder of the block was built up at this time with private residences, all of which stood back a considerable distance from the street line. On the north side of the same block were similar buildings, except that at the end of the block nearest Brooklyn avenue stood four contiguous houses, not quite so far back from the street line.

Mr. Howard O. Wood, one of the residents of the block, saw the notice of sale on the vacant lot and consulted Mr. Nissen and Mr. Morse, both owners of property in the block. Wood asked these gentlemen if they thought the neighborhood would stand behind a purchase of the vacant property for the protection of the neighborhood. The next day at the instance of Mr. Wood the vacant property was bid in at the price of about $28,000.

The day after the bidding in of the property, Wood saw Wallace, told him of the purchase, and asked him what he thought of entering into an agreement for the protection of the block; Wallace

34

said " that if a setback agreement could be made, binding the owners of property on the south side of St. Marks Avenue, he would be glad to head a syndicate for that purpose," and outlined then the basis of such syndicate, it being proposed by him that each participant therein should go in on the basis of his front foot ownership on St. Marks avenue; that the property should be paid for and should be carried until such a time as it could be sold subject to the direction of those who signed the so-called syndicate agreement. Wallace then suggested the People's Trust Company of Brooklyn as trustee. Wood then notified the resident owners on the south side of St. Marks avenue, and two or three on the north, and he saw and talked with Messrs. Hentz, Murray, Morse and Nissen; they all agreed that the trust agreement should be made with the People's Trust Company; and each agreed to contribute their share toward the syndicate to pay the cost of the property; to pay taxes and interest until the property should be sold pursuant to an agreement to be made by them designating to whom it should be sold, and upon a covenant of " setback."

In the written agreement subsequently duly executed, the People's Trust Company was named as party of the first part, and James N. Wallace, Ludwig Nissen, Horace J. Morse, Elizabeth Schultz, Mary E. McDermott, H. O. Wood, Emily S. Wood, Charles E. Warren, Thomas E. Murray and Henry Hentz parties of the second part. The agreement has this opening recital: " Whereas, the parties of the second part, the owners and holders of certain property on St. Marks Avenue, between Brooklyn Avenue and New York Avenue, * * * For their mutual protection have bought for the sum of $28,100 and taxes due May 1, 1917, certain property on the south side of St. Marks Avenue, * * * and are about to cause the same to be conveyed to the party of the first part." The trust company agreed to hold the property in trust for the benefit of the parties of the second part, to hold it until such time as a majority of the parties of the second part should require in writing the same to be sold to a grantee of their selection at a named price.

The trust company held the property under this agreement until the spring of 1919. Then appeared two bidders for the property, a Mr. Fraser for the plaintiff Schultz, and Mr. Aaron, a defendant, through a broker named Hyland. The bid of the plaintiff Schultz was approximately $33,000 and Wood was given to understand that Aaron would pay more, but Aaron insisted on building on the property apartment houses. The bid submitted on behalf of the plaintiff Schultz contemplated the tearing down of the adjoining property belonging to Mr. Schultz and then

building on the combined frontage of seventy-five feet and fifty feet private semi-detached houses.

Wood then saw Wallace and asked him what he thought of accepting the Fraser bid for private houses; and further asked him whether an effort should be made to get more for the property allowing apartments to be built, but subject to a setback line. Wallace said he thought apartment houses might be built on St. Marks avenue in the future, but that the front setback line formed by the houses must be maintained; that under the circumstances he would rather sell to the builder of private houses than sell to the builder of apartment houses, even though it necessitated a loss. Wood then consulted Messrs. Nissen and Morse, who expressed themselves " much more strongly than Mr. Wallace," and Wood then agreed to sell to Schultz provided the signers of the trust agreement consented. Under date of May 22, 1919, all signers of the agreement consented in writing that the People's Trust Company enter into a contract of sale of the property, and authorized the trust company to give a deed in accordance with the terms of the trust agreement. The written consent named the sales price, $33,000, but did not name the purchaser. All written consents so signed were identical except that signed by McDermott, which described the property as " on the South side of St. Marks Avenue, bought by us for our mutual protection." This consent also contained these additional words: " subject to a provision that no building shall be erected on the property within thirty-five (35) feet of the fence line, except open porticos or stoops, and that no buildings shall be erected on the St. Marks Avenue front except private residences."

All of the consents had this recital: '' We, the undersigned, who on the 8th day of May, 1917, made a certain agreement with the People's Trust Company, and with each other, in regard to premises on the South side of St. Marks Avenue, bought by us for our mutual protection." On June 13, 1919, the People's Trust Company executed a contract for the sale of the vacant lot to Elizabeth Schultz, one of the plaintiffs. The contract contained the following: " Subject to covenants and restrictions contained in prior deeds and subject to a covenant that no building shall be erected upon the premises conveyed in front of the present house line formed by the residences of Schultz, Morse and Nissen; said covenant to be made by an agreement between Elizabeth Schultz, Horace J. Morse and Ludwig Nissen, to be signed and recorded at the time of closing this title, and upon the further condition that the grantee build or cause to be built upon the St. Marks Avenue front thereof, private residences."

Second Department, July, 1922. [Vol. 202

Subsequently, and on July 25, 1919, a deed to the property was duly delivered by the trust company to Elizabeth Schultz, and contained the covenants recited in the foregoing contract.

In October, 1919, Wallace died and his executor in December, 1920, conveyed the Wallace property (not the former vacant lot) to the defendant McCafferty, but this deed contains no reference to any building line agreement.

Both before and after the deed from the trust company to Schultz, Wood wrote Wallace letters. In a letter dated May 22, 1919, Wood said that the property had been sold to Fraser who agreed to have " the main line of his building thirty-five feet back from the present fence line. The stoops, open in character, will be in front of this line. I went over the matter with him thoroughly and it seemed impossible to go further back, but this will give the general appearance of a line in uniform with your house and those of your adjoining neighbors." In a letter dated July 29, 1919, he stated: " As you know, we have sold the Emery lot for $33,000 with the covenant that only private houses be erected and a collateral agreement signed by Messrs. Schultz, Morse and Nissen that there be no building beyond the present house line. This preserves the integrity of the southerly side of St. Marks Avenue between Brooklyn and New York."

The complaint alleged that at the time of the conveyance of the property to the plaintiff Schultz, Mr. Nissen and Mr. Wallace made an agreement between themselves that they would not sell their property or cause it to be sold, excepting upon a similar covenant which they would cause to run with the land, agreeing each with the other to maintain the present residential line formed by the residences of Schultz, Morse and Nissen.

It is further alleged that defendant McCafferty entered into a contract of sale of the premises and that his transferee intended to erect thereon an apartment house in front of the residential line established and agreed to by Wallace.

It is conceded that the record title of the defendant McCafferty and his assigns is unrestricted. No written covenant is relied upon by the plaintiff; but the suit is based on parol agreements. No written agreement was ever made between Wallace and Nissen relating to their respective properties.

The first question presented for review is, whether Wood, who is not a party to this action, is disqualified as a witness under section 347 of the Civil Practice Act, formerly section 829 of the Code of Civil Procedure.

Is he a person interested in the event and was he examined in his own behalf or interest? The judgment entered herein could

not be offered in evidence for or against him, in another action commenced by him. Under the decisions, therefore, Wood was not precluded from testifying. (*Eisenlord* v. *Clum*, 126 N. Y. 552; *Hobart* v. *Hobart*, 62 id. 80; *Franklin* v. *Kidd*, 219 id. 409, 412.)

The vacant lot was purchased for the " mutual protection " of the owners. The only common object sought to be protected was the existing front building line on St. Marks avenue. All of the owners were interested in this subject, for it made the neighborhood more attractive and it made certain greater air and light to the various properties than would be the case without the setback restriction. Wallace expressly stated that " if a setback agreement could be made, binding the owners of property on the south side of St. Marks Avenue, he would * * * head a syndicate for that purpose." He subsequently did, and the other property owners subscribed their share to the syndicate.

It fairly appears from Wood's evidence that the intent of the various parties to the trust agreement was to secure a permanent setback restriction. They did not rely on the rather questionable permanence of line that might be secured by the mere limitation of the structure about to be built on the vacant lot acquired by them. Wallace even said he preferred to take less money in the sale of the property than to allow an apartment to be built on even a partial setback.

Counsel for defendants urge that such setback restriction is an interest in lands which cannot be created or granted by parol. While many of the text writers and many judicial opinions refer to such implied covenants as " an equitable negative easement," others hold that there is merely an estoppel *in pais*. An estoppel *in pais* does not create a technical title in land. Its effect is to conclude a party from denying the effect of his statements or admissions designed to influence, and which have influenced, the conduct of another, and when so applied it is as effectual as a deed would be from the party estopped. (*Bimson* v. *Bultman*, 3 App. Div. 198.)

Professor Reeves in his work on Real Property (§ 148) states as follows: " From covenants or conditions in deeds, and even from oral agreements or representations, equity frequently raises or implies easements which are not recognized in a court of law. These are always negative in character. Hence, they are often designated as negative equitable easements. They are brought into existence and enforced by courts of equity, for the purpose of working out justice between owners of neighboring lands, and in disregard of the existence or non-existence of privity, or contractual or conventional relationship of any kind between such

neighbors." So in *Tallmadge* v. *East River Bank* (26 N. Y. 105) it is held that " The owner of land may, by parol contract with the purchasers of successive parcels, * * * affect the remaining parcels with an equity requiring them also to be occupied in conformity to the general plan, which is binding upon a subsequent purchaser with notice of the fact, though his legal title be absolute and unrestricted." It is true that in the *Tallmadge* case there was a notation on a map of the line of contemplated building, and in that case the contract of sale had a provision that it was subject to any existing right or easement, if any, by reason of any claim of a building line restriction. There are many cases of an individual or a corporation owning a large tract of real estate, going into a general plan by filing a written plan and on an oral statement that he will build on the remaining lots not sold so as to observe the restriction. This oral agreement to observe the restriction has always been enforced in such common building plans.

It may be said in the case at bar that the owners of the block were owners in common of the vacant lot; and when they conveyed to the plaintiff Schultz, retaining their several ownerships in the adjoining lands, they did it having in mind the existing building line already established. The contract was already executed as to the setback line as to remaining houses, and the only thing the several grantors could have had in mind was the perpetual saving of the common line.

In the case of *Norton* v. *Ritter* (121 App. Div. 497) the defendant sold to the plaintiffs two lots free and clear, without any restrictive covenants in the deed. At the time of conveying to the plaintiffs, defendant promised that no buildings other than private residences would be erected upon other adjoining lands owned by him. The action was brought, in that case, to restrain the erection by the defendant of an apartment house upon the lots concerning which the promise was made. This promise was entirely oral. The case at bar differs from this in that the lots granted did have the restriction of setback in them, whereas in the *Norton* case there was neither restriction imposed upon the original grantee nor any imposed upon the remaining land.

As to the question of notice to McCafferty, and Aaron, his grantee, the evidence though slender supports a finding that they had knowledge that the owners of the block had entered into a contract to preserve the setback line on their block. The witness Fraser told McCafferty that the neighbors had all agreed to the setback, and that, so far as he understood, they had agreed from McDermott's corner down to Jones' corner, and that there could nothing come in there that would injure or damage the property

in any way. McCafferty said he thought it was fine to go in and spend the money to improve the neighborhood. Nissen mentioned the restriction to McCafferty a week or two after the property was purchased, and McCafferty said he knew all about it. This was denied by McCafferty. The testimony of Mr. Hyland, the broker for Aaron, discloses that he told Aaron that the proposed house, if built there, would have to be up to within the line or along the line of the adjoining houses; that they (referring to the neighbors) wanted to protect the property and keep the line so that any building would not project beyond the residences.

The judgment should be affirmed, with costs.

Present — BLACKMAR, P. J., RICH, KELLY, MANNING and KELBY, JJ.

Judgment unanimously affirmed, with costs.